### No. 227.—C. T. DUNN v. JOHN CALDERWOOD.

During the late war C, a British subject, entered into a contract with A, a resident of the State, whereby the former was to receive and take in his possession a large quantity of cotton and ship the same to Europe and divide the profits arising therefrom equally with A. A further condition of the agreement was, that if the cotton was destroyed or taken possession of by either of the contending forces, that then C was to recover and pay over to A his proportion of the amount so recovered on account of such forcible taking or destruction.

The cotton was not taken or destroyed by either of the contending forces, but was destroyed by the accidental burning of the gin house in which it was stored. C gave his notes at the time of the execution of the contract in favor of A for an amount equal to his estimated interest in the cotton in case it was sold by C in Europe. A now brings suit on the note.

Held—That the contract of the parties in reference to the cotton and for which the note appears to have been given was not a sale of the cotton, and therefore C, who had given the note, was not in possession at the time it was destroyed by fire. That, not being in possession under a title he could not be held liable for the price or value thereof.

APPEAL from the Fourteenth Judicial District Court, parish of Ouachita. *Ray, J. D. C. Morgan* and *R. W. Richardson*, for plaintiff and appellee. *Stubbs & Cobb*, for defendant and appellant.

TALIAFERRO, J. The plaintiff sues on a promissory note signed by the defendant on the twenty-second of August, 1863, payable one day after date to C. T. Dunn for $7580.

The defendant excepts to the action, alleging that the plaintiff ought not to recover upon his demand on the ground that his suit is premature, as any liability defendant may incur under the agreement between himself and the plaintiff depends upon the delivery by plain-

Dunn v. Calderwood.

tiff to the defendant of a certain amount of cotton, to be by him shipped to Europe and sold on joint account, which cotton the defendant avers the plaintiff has never delivered

The defendant answered, adopting the allegations of his exception, and denied generally the allegations in plaintiff's petition.

In the court below there was judgment in favor of the defendant, rejecting the plaintiff's demand. The plaintiff has appealed.

It appears there were two contracts, or one contract evidenced by two instruments, written and printed. These documents fill several pages of the record, and seem clearly to show the purpose and intention of the parties; and it is in reference to that purpose that the entire act or acts must, in the sense and meaning resulting from a consideration of the whole, be examined. The circumstances under which the parties contracted must be looked to as giving complexion to and explaining the contract they entered into. A state of war existed in the country. Federal troops were advancing into the interior from the Mississippi, and it was apprehended they would pass through the parish of the plaintiff's residence, where he had a large amount of cotton, some of which was baled, and a considerable portion of it unginned or in the seed. Cotton was thought to be in danger of destruction from both friend and foe. The Confederate authorities had adopted the policy of burning cotton to prevent its falling into the hands of the Federal forces, and it was believed to be in danger of capture by the National troops. Calderwood, the defendant, was a British subject, never having become an American citizen. He, on the ground of neutrality, it was assumed, could protect his own property from being destroyed or appropriated by the parties in conflict. Calderwood signed the note in question, expressing an obligation to pay Dunn a sum of money ($7580), and Dunn signed a receipt to Calderwood expressing the receipt of $7580 as being in full payment for sixty-two bales of cotton, weighing in the aggregate twenty-four thousand eight hundred pounds, and for one hundred thousand and eight hundred pounds of " seed cotton unginned."

The written instruments express that Calderwood is bound to pay Dunn fifteen cents per pound in gold for the baled cotton, and $3780 in gold for the cotton in the seed " so soon as the cotton can be transported to Europe and sold." In one of these instruments Calderwood binds himself to pay Dunn one-half of the net profits made on the sale of said sixty-two bales of cotton, and in the other he binds himself to pay Dunn one-half of the net profits made on the sale of said unginned cotton. One of these acts expresses that Dunn "takes upon himself the risk of the loss of the cotton through the acts of either government; that is, if the cotton be destroyed or taken either by the Government of the United States or by the Confederate States, and

the value thereof be not recovered by said John Calderwood after exhausting all proper means of redress, then and in that case the note which said Calderwood has this day executed in my favor for $3700 shall be canceled and be void." The other instrument contains the same stipulation, and declares that after all proper means used by Calderwood to obtain redress the note executed for $4700 shall be canceled and become void.

In the month of April of the year following the plaintiff's gin house was burned, with the cotton stored in it at the time. There is in the record a large amount of testimony introduced by the plaintiff to establish the quantity of cotton in the gin at the time of the accident, all of which was destroyed by the conflagration. This, he seems to consider, important to show, as he makes the point that the contract entered into by himself and Calderwood was a sale to him completed by delivery, and that the cotton was at the risk of the purchaser. The destruction of the gin by fire and the resulting loss of all the cotton that was in it at the time is shown to have arisen from an accident, and not from the act or through the agency of either of the hostile powers engaged in war.

It is shown that not long before the gin was destroyed the "cotton burners" visited the plaintiff's plantation, and that a small quantity of his cotton was burned by them. The quantity of cotton destroyed by the burning of the gin afterwards, if it were important to ascertain, is involved in uncertainty. It is proved that very shortly before the advent of the burners there had been cotton removed from the plantation. The officer in command of the squad that came to burn the cotton testified that he went into the gin with the plaintiff to look at the cotton, and that they agreed there "were about seventeen bales, seven or eight of it in the lint." Taylor, a witness, testifies that he was present at the time, and says there were not a hundred bales of cotton in the gin at that time. And afterwards witness states that in a conversation with Dunn, the plaintiff, in regard to the quantity of cotton in the gin house when it was burned, he remarked to Dunn that he (witness) did not think there were a hundred bales, or anything like it, at the time. The testimony of the plaintiff and others show that a considerable amount of cotton, both in the bale and in the seed, was removed just before the coming of the burners to keep it out of their way. The accidental burning of the gin occurred a few days afterwards from fire communicated to it from burning timber in close proximity to it. We do not find that during the interval between the appearance of the cotton burners and the destruction of the gin house, any of the cotton removed before their arrival, was carried back to the gin. But we do not regard it important to know what amount of cotton was lost by the accident. We can not regard the agreement

between the parties as a sale. The written instrument containing the agreement sufficiently shows its character. The cotton was to be considered as belonging to Calderwood if it should be destroyed by the Federal forces, as in that event there would be a chance for Calderwood, a British subject, to recover its value from the United States. If it escaped destruction in that direction, Calderwood was to pay him, after sale of the cotton in Europe, one-half of the *net profits* on the cotton. We conclude the plaintiff has no legal or equitable right to recover.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be affirmed with costs.

Mr. Chief Justice Ludeling recused.